We'll hear argument first this morning in Case 14-7955, Glossip v. Gross. Ms. Conrad? Mr. Chief Justice, and may it please the Court, Oklahoma chooses to execute our clients with a three-drug formula that includes a paralytic in potassium chloride, drugs that cause intense pain and suffering. The second and third drugs are constitutional only if a prisoner will not feel the pain and be aware of the suffocation caused by those drugs. The district court erred as a matter of law and as a matter of fact when it found that midazolam as the first drug is constitutionally tolerable. Why is that a matter of law? I mean, as I see it, it's just a fact question, and the district court found that it did eliminate the pain, and you're asking us to find that the district court was clearly erroneous in that determination? Do we usually do that kind of thing? Justice Scalia, there's a question of law and there's a question of fact. What's the question of law? The question of law includes the fact that the district court found that this three-drug formula was constitutionally tolerable in spite of two facts, the first one being that there is a medical consensus that this drug cannot be used as a sole drug. That's a question of fact. You're saying the question of law is that the district court ignored two facts. Ignoring two facts does not make it a question of law. It's still a question of fact. If I can, Justice Scalia, the second point is the question of law also involves that the district court found that this drug creates a greater risk of harm than sodium thiopental, but that it could not quantify. So it found that this drug that creates a greater risk of harm that it could not quantify, and it also had before it evidence that this drug is not used for the purpose that which the State intended it to use. Sotomayor, the way I've thought of this, and I know that in your brief you think de novo review goes to everything. If I disagree with you, if I think that I have to give deference to the district court's factual finding on how this drug works, the mis – how do you call it? Madazolam. Madazolam. But that it's a legal question of whether how that drug works creates a risk of harm that's constitutionally intolerable. Is that how you divide up the legal and – Yes, Justice Sotomayor. So the facts are now – now let's go to my real question, okay? That a judge ignores evidence is not necessarily an abuse of discretion or a clear error, but so what are the clear errors in terms of the reasoning that the district court used? So the clear errors in this case, we have to look at what this case is about. And this case is about known information and undisputed facts that were before the court. This drug, Madazolam, is in a different class than barbiturates. This drug is not known. It's not a pain reliever. The district court recognized these two facts at 76 of the joint appendix. It's known that this drug has a sealing effect. So there's a certain point at which giving more of the drug is not going to matter. The district court recognized that at 78. The State's expert recognized that. The Petitioner's experts recognized that. Roberts, but what the district court determined is that it was not able to tell precisely when the sealing effect kicked in, precisely when they hit the ceiling, right? That is your theory for when pain is possible, when it hits the ceiling, right? What the district court found, Mr. Chief Justice, is whatever the sealing effect may be, it takes effect only at the spinal cord, and that 500 milligrams of Madazolam will, quote, "...create a phenomenon which is not anesthesia, but effectively paralyzes the brain and eliminates awareness of pain." Now, that finding, we have to look at what undisputed facts were before the court in making that finding. Roberts, but is it undisputed facts? I thought you had the burden of showing that the determinations were clearly erroneous. So it's certainly not a case where the facts have to be undisputed. And I'm sorry if I misspoke, Mr. Chief Justice. What we have to look at before in order to show why this was a clearly erroneous finding is what the undisputed facts were before the district court in order for it to reach that conclusion. Do you even have to go that far? The State here doesn't even propose that their doctor was right on this point. They're not defending it. They don't say it's true. They conceded, as I read their brief, that it does not work the way the doctor said it worked, that it does not paralyze the brain. Correct? That is correct, Justice Sotomayor. So it's clear error. Now we've got an admission that the expert was plainly wrong. So how — what else, I guess? There was nothing else that the district court could have based its conclusion on, correct? That is correct. And the district court reached this decision based on no scientific evidence and with a medical consensus to the contrary that this drug is not able to pharmacologically do what the State's expert said that it could in fact do. And that clear error is combined. And as the district court said at Joint Appendix 47, that this is partially a mixed question of fact and mixed question of law. Ms. Conrad, can I make sure I understand this? Because, you know, I read that, the part of the opinion that you're referring to, and I just really couldn't figure it out. So is it that the court said, well, we don't know what the sealing effect is generally, but the sealing effect only goes to how something operates at the spinal cord level? It doesn't go to how it operates at the brain? And this takes — what we care about is how it operates at the brain, so we don't even have to worry about the sealing effect. Is that right? Is that what the court said? Justice Kagan, that is what the district court found based on the testimony of the State's expert that's not supported by any scientific literature, any medical information, and in fact is inconsistent with the State's expert's own testimony, because he testified and explained that the way this drug works is it works throughout the central nervous system. He said — So you're saying we do have to worry about the sealing effect. There isn't this dichotomy between the drug at the spinal cord and the drug at the brain. And it's actually crucial what kind of sealing effect this drug has, in contradiction to what the court said, which was we didn't have to worry about the sealing effect. Is that how it goes? Yes, Justice Kagan. Did you introduce any evidence to show the dosage at which the sealing effect would occur? We had testimony from our expert who indicated that it could be calculated, but it was not calculated. But, Justice Alito, that doesn't matter, because what matters is that we know that the drug has a sealing effect, and that is what matters. Well, what if the sealing effect is 1,000 milligrams? There is no evidence in the record to support that. And in fact, what's the record? No. I just asked for any evidence to show that it is any amount below 500. It doesn't matter. It doesn't matter. Of course it matters. One proof we do have is the Wood execution, not the one that was botched, but Mr. Wood was given 750 milligrams, correct? Yes, Justice Sotomayor. And he laid writhing in pain for 20 minutes, 25 minutes? I don't remember how long. Mr. Wood was 2 hours. I'm sorry, 2 hours. Now, there has been some defense that the 750 wasn't immediately delivered, but it was still 750 that went into his system and caused that kind of pain, correct? Yes. And our expert testified that Mr. Wood's execution demonstrates the sealing effect, that giving more of this drug is not going to put a prisoner into a deep coma-like state. How many executions have been carried out using this drug? Using midazolam? Yes. Fifteen. Okay. And you're talking about one. No. We're actually talking of several executions. The execution in this case in Oklahoma that happened a year ago of Mr. Lockett demonstrates why midazolam is not a proper drug that can do what the State intends it to do and put a prisoner in a deep coma-like unconscious. I thought there were issues of the administration of the drug, you know, the nature of the veins and so forth. Weren't those present? I've got a different one in mind in the Lockett case. No, Mr. Kagan. I'm sorry, no what? That was not then? Or were there issues about the — I thought there were issues involving the veins and the ability to make an intravenous connection. There were problems with the catheter, but Mr. Lockett received enough midazolam such that he was unconscious, and the doctor, the physician executioner found that he was unconscious, and then he regained consciousness. And that is the key issue here before this Court. Not if he didn't receive the proper dosage. You're saying it's okay that he didn't receive the proper dosage so long as he was unconscious. I don't see how that follows. I mean, if in fact the execution was not properly conducted, I don't see how you can blame it on the drug. What we know about this drug, Justice Scalia, is that it can never maintain the deep coma-like unconsciousness that is necessary to prevent a prisoner from feeling the painful effects of the — I'm sorry, of the — How do we know that? I thought that what we knew was something different. I thought that what we knew was just that we can't know. In other words, that there's this huge range of uncertainty about what happens when somebody is given this drug. You're suggesting something more than that, which is that we know what happens. We know that the drug can't maintain deep unconsciousness, which is right. Justice Kagan, we know because of the pharmacological properties of this drug. The way that when the drug was being tested and being introduced, it is not used for the sole purpose of preventing somebody from feeling pain during a painful procedure. Well, I thought it wasn't used for that purpose just because we don't know whether it's capable of being used for that purpose, as opposed to we know it's incapable of being used for that purpose, if you see the difference. I do see the difference, but I think what's important here is this court in Bays explained that it's important to reemphasize that a proper dose of sodium thiopentol obviates the concern that the prisoner will not be sufficiently sedated. That was the key aspect of Bays. And why is Oklahoma not using sodium thiopentol? Why is it not using that drug? It isn't using it. You could ask my friend here, but — You don't know? The finding here is that it was unavailable at that time of the hearing. Yeah. I mean, let's be honest about what's going on here. Executions could be carried out painlessly. There are many jurisdictions. There are jurisdictions in this country, there are jurisdictions abroad that allow assisted suicide, and I assume that those are carried out with little, if any, pain. Oklahoma and other States could carry out executions painlessly. Now, this Court has held that the death penalty is constitutional. It's controversial as a constitutional matter. It certainly is controversial as a policy matter. Those who oppose the death penalty are free to try to persuade legislatures to abolish the death penalty. Some of those efforts have been successful. They are free to ask this Court to overrule the death penalty. But until that occurs, is it appropriate for the judiciary to countenance what amounts to a guerrilla war against the death penalty, which consists of efforts to make it impossible for the States to obtain drugs that could be used to carry out capital punishment with little, if any, pain? And so the States are reduced to using drugs like this one, which give rise to disputes about whether, in fact, every possibility of pain is eliminated. Now, what is your response to that? Well, Justice Alito, the purpose of the Court is to decide whether a method of execution or the way that the State is going to carry out an execution is, in fact, constitutional, and whether we are going to tolerate, is it objectively intolerable to allow the States to carry out a method in this way. And so the State is going to tolerate. And I guess I would be more inclined to find that it was intolerable if there is even some doubt about this drug, when there was a perfectly safe other drug available. But the States have gone through two different drugs, and those drugs have been rendered unavailable by the abolitionist movement, putting pressure on the companies that manufacture them, so that the States cannot obtain those two other drugs. And now you want to come before the Court and say, well, this third drug is not 100 percent sure. The reason it isn't 100 percent sure is because the abolitionists have rendered it impossible to get the 100 percent sure drugs. And you think we should not view that as relevant to the decision that you are putting before us? Justice Scalia, I don't think that it's relevant to the decision as to what's the drug that the State is intending to use to cause what they say is a put the prisoner in a place where he will not feel pain, that that drug is good enough. This drug is to any State using a lethal injection protocol without this questionable drug. We know that two are not available. Is there another combination that has been used by States that doesn't involve this questionable drug? Yes, Justice Ginsburg, and in fact, there have been 11 executions using pentobarbital just this year by other States. But that doesn't answer Justice Scalia's and Justice Alito's question. The question is what bearing, if any, should we put on the fact that there is a method, but that it's not available because of opposition to the death penalty? What relevance does that have? None? Justice Kennedy, the fact that the State chooses a certain method should not have bearing on whether that method is constitutional. I would like an answer to the question. You've been interrupted several times. And you still haven't given. Is it relevant or not? No. It's not relevant. The availability of a number of other methods. Sotomayor, there are other ways to kill people, regrettably, that are painless. It doesn't have to be a drug protocol that we elect that has a substantial risk of burning a person alive who's paralyzed, correct? That is correct, Justice Sotomayor. I know that you'll get up and argue that those other ways are not constitutional either, potentially. But people do that with every protocol. But the little bit of research I've done has shown that the reason people don't use the other methods is because it offends them to look at them. Like, you could use gas. That renders people not even knowing that they're going to sleep to die. And people probably don't want to use that protocol because of what happened during World War II. But there are alternatives. Oklahoma's found some. It's can use the firing squad now. So I don't know what the absence of a drug, what pertinence it has when alternatives exist. I would agree, Justice Sotomayor, that this is a firing squad cause pain. Justice Ginsburg, we don't know. We don't know how, if the State chose to carry out an execution by firing squad, whether, in fact, it would cause rise to the level of unconstitutional pain and suffering. Well, you don't know. Do you have a guess? I mean, is there a reason that States moved progressively to what I understand to be more humane methods of execution? Hanging, firing squad, electric chair, death, you know, gas chamber. And you're not suggesting that those other methods are preferable to the method in this case, are you? I'm not suggesting that, Mr. Chief Justice. But the reason why States moved to more humane methods is as we learn more and as we learn more about science and develop, then as a society, we move forward. We have evolving standards. But you have no suggestion as to what would be an acceptable alternative to what you propose right now for Oklahoma. Do you have any? I mean, the case comes to us in a posture where it's recognized that your client is guilty of a capital offense, it's recognized that your client is eligible for the death penalty, that that has been duly imposed, and yet you put us in a position with your argument that he can't be executed, even though he satisfies all of those requirements. And you have no suggested alternative that is more humane. I would actually disagree with the characterization that it's — that he can't be executed. Oklahoma has just passed a new statute, and they are continuously looking for methods and ways to— What does the new statute provide? The new statute provides that if the lethal injection protocol is found unconstitutional or drugs are unavailable, then they can go to other methods. What other method? They go to nitrogen gas and then go to— And are you suggesting that that's okay with you? I'm not — I don't know anything about that protocol. They have not— Well, what do you think? Do you have an instinct about whether or not the gas chamber is preferable to this lethal injection or not? Mr. Chief Justice, it's hard for me, in the abstract, to say whether it's preferable. The legislature has said that this could be a painless method. I don't know. They haven't come out with any information about how it can be carried out. Scalia, it's true. But then the fact here, your client was already in jail with a life sentence, right, for murder. And while in jail on that life sentence, he stabbed and killed a prison guard. And that's the crime for which Oklahoma is seeking to execute him. That's the fact we have before us, isn't it? One of the Petitioners here before the Court. But the—  It's not you. You didn't purposely hide these other kinds of drugs. The — if there is no method of executing a person that does not cause unacceptable pain, that, in addition to other things, might show that the death penalty is not consistent with the Eighth Amendment. Is that so or not, in your opinion? That — that perhaps could be true, Justice Breyer. But the narrow issue— And is that your argument? No. You're making — you can make one of two arguments. And one is that the death penalty is unconstitutional because there is no method that has been used in the past or that can be devised that is capable of carrying that sentence out without inflicting some pain, pain that's unacceptable. That's an argument you can make. But I don't understand you to be making that argument. Am I right? You are correct, Justice Alito. So you are arguing — you want us to reverse a finding of fact of a district court on the ground that it is clearly erroneous. When was the last time we did that? The court in Comcast, and we cited that opinion, it was a few years ago, and explained that where there are clearly — clearly erroneous findings, in this case, this is obviously and exceptionally erroneous. Looking at the findings based on no scientific evidence, no studies, and all of the evidence shows that this drug does not work in the way that the State intended to. But 500 milligrams is a lethal dose, isn't it? In itself, it's capable of causing death. Is that right? That — I don't know, Justice Alito. So that — if the expert who testified for the State talked about a potential toxic dose, but there's no information of, yes, this dose will cause death. Can you look at that? Is it a therapeutic dose? Is there — is it ever administered in that quantity for any therapeutic reason? No. Is the fact that something is a lethal dose necessarily mean that it's not incredibly painful? No, Justice Kagan, and that's part of the question. It could be a lethal dose and be incredibly painful. No, but that's not the point. The point is if it's a lethal dose, or it's potentially a lethal dose, then how are you going to do a study to determine whether, in fact, it renders the person insensate? Justice Alito, you don't need to do a study in this case, because we already know from science and the pharmacology of the drug how the drug works. And so that's what the district court got wrong, and there's clear error here. And maybe to the extent that you can't do it. I'm sorry, Justice Kagan, I think it's your turn. Please, go ahead. I'd just like, since we're on the narrow question, the narrow question that you want to present, I would like to hear the argument. As far as I know, we held in Bayes, in this context, that if the person is not rendered unconscious, where the other two drugs come in, there is a constitutionally unacceptable risk of suffocation and pain. That's the whole. And in this case, the court of appeals says that the district court found that this drug that you're talking about, midazolam, will result in central nervous depression, rendering the person unconscious and insensate during the rest of the procedure. A sufficient level of unconsciousness to resist the major stimuli of the later two drugs. That's his finding. You had an expert testify that that is not the case. That expert said that, on citing an article, he said that it would not reliably put the person in a coma. Isn't that what he said? That is correct, Justice Breyer. Breyer, then the other side produced the expert, which just said the contrary. All right. So you have to say that that conclusion, namely, quote, the 500 milligrams will be at a we'll make it a virtual certainty that he will be at a sufficient level of unconsciousness to resist the stimuli of the other two drugs. So I'm sorry, I've run out of your time. Maybe I'll ask the other side the same question. I want to know what underlies that sufficient to make you say, clearly wrong. But the other side is just as good to ask that question. I want you to reserve your time. Okay. Mr. Weyrich. You can ask me, maybe. Mr. Weyrich. Mr. Chief Justice, and may it please the Court. The district court found, as a matter of fact, that a 500 milligram dose of midazolam would, with near certainty, render these Petitioners unconscious and unable to feel pain. Now, regardless of our other disagreements about proper legal standards, all parties agree that Petitioners bear the threshold burden of establishing that there is a substantial or objectively intolerable risk that they will feel the pain from the second and third drugs. Unless that finding of fact, a finding of fact affirmed by the court of appeals, mirrored by three other trial courts in Florida, affirmed by three other appeals courts in Florida, is set aside, they cannot satisfy that threshold burden. Mr. Weyrich, as I understand it, there were three subsidiary findings that underlay this conclusion. The first is the one that we talked a little bit about with Ms. Conrad, which has to do with the fact that, as I understand it, you don't at all defend. The second is the idea that 500 milligrams of this drug would likely kill a patient in 30 minutes or an hour, which seems to me irrelevant, given that a lethal dose is completely consistent with unbearable pain. And the third is that that dose of midazolam would keep a patient unconscious while a needle is inserted into his thigh. Which also seems irrelevant, given the, what everybody understands to be, the much, much, much greater potential for pain of potassium chloride. So those were the three subsidiary findings. One of them nobody thinks is anything other than gobbledygook, and the other two are irrelevant. Is that not the case? Well, I'm going to take those in reverse order. I think the third actually is relevant. These Petitioners, in their amended complaint at paragraph 139, describe the setting of ephemeral IV as an invasive surgical procedure involving not just pain, great pain. That's how they described it. Well, it does not sound pleasant to have a needle put in your thigh. But when you read these descriptions of what midazolam does, that it gives the feeling of being burned alive, it sounds really considerably more than having a needle put in your thigh. And this is what I want to clarify as to your first point. Midazolam itself, there is no evidence and no one argues that it causes any pain upon injection. It is a sedative hypnotic. It is the second and third. No, no, no. I'm sorry. Potassium chloride. So, you know, earlier some of the questions you said about whether this is lethal or not is irrelevant because it would involve great pain. No, a lethal dose of midazolam would not cause pain. It just not. No, no, no. It's a central nervous system. That's not the point. It's a lethal dose of potassium, of midazolam. It will take 30 minutes to die. In the meantime, the potassium chloride can be wreaking extraordinary pain on the individual. So in that sense, the fact that this is a lethal dose of midazolam has nothing to do with the question that is before us whether, before that 30 minutes or hour passes, the potassium chloride is wreaking unbearable pain on the individual. The question before the Court is whether the district court's factual finding that they would be unconscious and insensate is clearly erroneous. And on that point, let's look at the record case that these Petitioners put on before the district court. They said that there were three reasons why midazolam was inappropriate. They said paradoxical reactions, those have disappeared from the case. You won't even see those in the reply brief. We pointed out that they're extraordinarily rare and to the extent that they happen, trained medical, our trained medical staff would catch those and never call the person unconscious. Secondly, they said lack of analgesia. We pointed out sodium thiopental and penobarbital, those weren't analgesics either. That's never been relevant to the question, because the question is does the drug render them unconscious and insensate. Sotomayor, our pain relief medication. Sotomayor, what's the third point you had? I was anxious to hear your third point. As was I. In response to Justice Kagan's question. Yes. Yes. I forget now your second point, your second factual finding, or second underpinning factual finding. You know, there's the fact that this is a lethal dose, again, completely consistent with the possibility of potassium chloride causing great pain. There's the fact that it renders the patient unconscious with a needle, completely consistent with it not keeping a patient unconscious with potassium chloride running through his body. And again, this statement that nobody can figure out about the sealing effect. Right. And it's the sealing effect that I want to focus on. Because what the district court said is whatever the sealing effect may be, what we're concerned about is whether this can keep someone unconscious and unaware of pain. And when he talked about that's a phenomenon that's not anesthesia, what he was referring to is their expert, Dr. Lebarski, he said that in the medical sense, to have true anesthesia you have to have unconsciousness, inability to feel pain and immobility. Our district court was saying, well, what we care about with midazolam is will it render them unconscious and unable to feel pain. Under their expert's definition, they may not, that may not be anesthesia in the medical sense, but it's the constitutionally relevant question. Ginsburg. What do we do with this brief of the pharmacology professors that state flat-out midazolam cannot induce coma-like unconsciousness? They actually go further and say, you know, in several respects that it can induce unconsciousness, and that's something that no one agrees with. Even the FDA label indicates that induction of anesthesia is a commonly accepted use of medication. Breyer. Can I ask the same question, which is I've had this one question, and that is, as I read this record, you remember what I said was the standard from Bayes, you remember what I said was the district court's finding, you remember that I believe that what this is about is whether that finding is clearly erroneous, and what I have are two sentences. The first sentence is from their expert, and he quote, when you could be unconscious, he means that this drug, midazolam, is an anti-anxiety drug, like Xanax, people use to go to sleep every night, and it can render you unconscious. And not reacting to minor stimuli. That's their expert. But when major stimuli, such as the introduction of the next two drugs that we're talking about here come into play, you are jolted into consciousness and you are quite aware and you wake up. If we stop there, you'd lose, right? If we stop there. If any of that were supported by the medical system. Breyer. He pointed to two articles. He based that statement, but I'll look at the two articles. It seemed to me he was basing the statement on medical articles. Okay? We have to look at the support for that. Now, let's look at the other side, because your side then says, he says right here that he says it will put you into a coma. That's his point. But his reasoning was that if you take enough of it, you'll be dead. And then he says this is essentially an extrapolation from a toxic effect, by which he means if you take a lot, you'll be dead. But before you're dead, you're in a coma. And that's his reasoning. And I didn't find any other reasoning. Now, the obvious thing are two. One, a lot of things kill you without putting you into a coma, such as the next two drugs. Lots of things do. And two, he didn't point to anything in support of this putting you into a coma. It was just the extrapolation. Now, that's what I want you to focus on, because if what I've just said is correct, then I think there is no support in this record for his conclusion. If what I've said is incorrect, there might be support. Well, a couple of things. First, that assumes that a deep coma-like level of unconsciousness is the relevant question. They argue that this Court's case is in the Constitution and requires that. Now, that's beyond a surgical plane of anesthesia that we would use in an operating room to remove one of your limbs. A coma is brain dead, EEG silence. Would any doctor use this drug? Any doctor who is conducting a surgical procedure, who doesn't want the patient to suffer pain, wants to induce this unconscious state, would any doctor in the country give this as the drug to induce that coma-like unconsciousness? It is routinely used to induce anesthesia. It is not commonly used anymore for the maintenance of anesthesia for hours for surgeries. Now, their source, this is the Sari article, and that's spelled S-A-A-R-I, that their expert cited, and you can find this in the JA at 243 in his report, he cited this article. And if you actually read the article, it explains why midazolam is no longer used for maintenance of general anesthesia. It says, and I'm quoting, "... midazolam has been used to induce and maintain general anesthesia. The recovery period of midazolam is approximately three times longer than propofol. Propofol is the drug that's more commonly used now. Therefore, the genuine use of midazolam as the sole induction and maintenance agent for general anesthesia is nowadays exceptionally uncommon and has been replaced by induction and maintenance infusions of propofol. For organizational and economic reasons, fast-track recovery has gained popularity. That's why midazolam. Sotomayor, I have a real problem with whatever you're reading, because I'm going to have to go back to that article. I am substantially disturbed that in your brief you made factual statements that were not supported by the cited sources, and in fact, directly contradicted. I'm going to give you just three small examples among many I found. So nothing you say or read to me am I going to believe, frankly, until I see it with my own eyes, the context, okay? I'll give you the three examples. On pages 4 and 5 of your brief, you cite this drug's FDA-approved label as holding that this drug can get you to mild sedation and to deep levels of sedation, virtually equivalent to the state of general anesthesia, where the patient may require external support for vital functions. But this quote was not on general use. This quote came from the section of the FDA label where it was saying that this drug's effects, when taken with other drugs that suppress the central nervous system, this can happen. That to me is really, there is no other central nervous system drug at play in this protocol. On page 6, you cite the milk. Breyer, have an answer to that one? Respectfully, Justice Sotomayor, in the brief we explained that the FDA label says that the effects of the drug depend upon three things, the rate of infusion, I think it's the maintenance of the infusion, the rate, the dosage, the rate of infusion, and whether it's used in conjunction with other CNS depressants. And then you quoted this for the proposition that it could cause a fatality because of the depression of, or it could produce general anesthesia. At JA 217, their expert agrees that it can cause a fatality. He agrees that it can cause a fatality. Sotomayor, but he said it's in old people. I'm, you know, there have been 80 deaths from therapeutic doses of this drug. It's un, this is almost like you saying because 80 people have died from the use of one aspirin, that means that if I give people 100 aspirins, they're going to die. It's just not logical. Obviously, people die from anything that you give them. That's why there are hospital fatalities in every procedure, and why there's hospital that, but 80 among the millions that are given this drug don't die. So my point is what the FDA is saying, the general anesthetic effect is only going to happen when you have a central nervous drug, central nervous system drug. The FDA has said no such thing. Well, they put it in that section. They described in that section the potential effects, and they described, they said three things matter when you're looking at the effects, how much of the drug you're giving, the rate at which you're giving it, and whether it's given with another drug. Exactly. Their expert said, unqualifiedly, he said the FDA tested this drug and projected it.  Sotomayor, let me give you a second example, the Melvin study. The Melvin study says, this is how it happened, it gave this drug in doses of 0.02 to 0.06. And what it showed was that at 0.06 dose, there was less effect than at 0.02. And he said, this suggests that there is a ceiling effect to this drug, and that it is less potent as you go in higher doses. Now, you quoted for saying, and you took out the eclipse, there may be a ceiling you quoted by saying that the Melvin study for the position that studies on humans have found that the anesthetic effect of midazolam increased linearly with dosage and estimate that 2 milligrams is enough for full surgical anesthetic. But what Melvin actually said after pointing out that the ceiling effect is shown by his study, he says, but presuming there were no ceiling effect, extrapolation of our data suggests that such a dose would be sufficient. You took out that. Respectfully, Justice Sotomayor, what they were comparing was a 0.2 milligram per kilogram dose of a different drug to a 0.6 milligram per kilogram dose of midazolam. They said we would have expected midazolam to have a greater effect than the other drug because it's more potent than the other drug. But as it turns out, there's two things going on. Either there's some dose-dependent relationship with the other drug, or they said there may be some ceiling effect here. They hypothesized that there may be. They say if there's not a ceiling effect and you extrapolate out what we know about the drug, you get the full anesthesia at 2 milligrams per kilogram. Sotomayor, what we're back to, is there a ceiling effect? Judge here said it doesn't matter. And let's talk about their evidence. First of all, neither of their experts could say at what level a ceiling effect occurs. And it's not relevant whether there is or is not a ceiling effect. Their experts said all drugs have a ceiling effect at some point. What matters is, is there a ceiling effect that kicks in before we get to a level where they're unconscious and unaware of the pain? That's the constitutionally relevant inquiry. And on this point, they presented the district court with two pieces of evidence, Dr. Lebarski, a material safety data sheet from Edazolam that, as we pointed out in our brief, never even mentioned ceiling effect. And they've Kagan, it would be very different if the Court had said, look, we don't think you've presented enough evidence that the ceiling effect kicks in at this point, right? But that's not what the Court said. The Court had this alternative theory, which is that it didn't have to concern itself with whether the ceiling effect had kicked in. And that's the thing that not — that you don't defend as well. But that was what the Court said. I — that's not quite how we read the district court's opinion. What we said, he recounted their explanation of what the ceiling effect was. I think this is at JA 77 or 78, and says, but whatever it may be with respect to anesthesia, he said, which occurs at the spinal cord level. He said that the ceiling effect doesn't affect the brain, and that's just wrong. You know that's wrong. We know that a central nervous system depressant works throughout the central nervous system, right? So it's affecting these GABA receptors, which are located in the spinal cord and in the brain. Now, his point was, perhaps those GABA receptors could be fully saturated with GABA at the spinal cord level. But the question is, at the brain level, are we, in his words, paralyzing the brain to such an extent that the person is unconscious and unaware of pain? And he said he thought the evidence was sufficient to conclude that it was. And we look at the evidence that takes place. Kagan. Kagan. I think if we go back and read it, it will show that what he was saying was we just don't have to worry about the ceiling effect, because at the brain level, the ceiling effect has no relevance. Let me ask you another question. Maybe this is one we'll agree on. Maybe not. I'm not sure. Do you think that if we conclude that there is just a lot of uncertainty about this drug, in other words, you know, you might be right or Ms. Conrad might be right, and it's really just impossible to tell. Given that nobody does studies on this drug, it would be unethical to do studies on this drug. We simply can't know the answer to these questions. If that's the state of the world, do you think it's a violation of the Eighth Amendment to use it? If there is a risk of serious pain that rises to a substantial or objectively intolerable. No, you're just repeating the standard. But I'm giving you a set of we just don't know. It might be substantial pain. It might not be substantial pain. I mean, we can't quantify it at all. If what you're suggesting is shifting the burden to the State to show that there is some medical consensus that a drug can in fact do this at these doses, because we know that. I'm not talking about burdens. I'm talking about a district court who is presented with evidence. Just put yourself in the position of a district judge, and the evidence is who can tell? Nobody can tell. What is a district court supposed to do at that point? Well, this Court in Brewer v. Landrigan, which was an appeal from the Ninth Circuit in a similarly postured case, it was a temporary injunction that was a challenge to the efficacy of lethal injection drugs, vacated a temporary injunction granted by lower courts and said the burden is on the Petitioner to show that it is sure or very likely that they will suffer from the harm. They said speculative evidence isn't enough. So that's the burden that they bear. Kagan. So then I think I have not found a place where I agree with you, because that seems quite something to me. I mean, that would be like saying — people say that this potassium chloride, it's like being burned alive. We've actually talked about being burned at the stake, and everybody agrees that that's cruel and unusual punishment. So suppose that we said, we're going to burn you at the stake, but before we do, we're going to use an anesthetic of completely unknown properties and unknown effects. Maybe you won't feel it. Maybe you will. We just can't tell. And you think that that would be okay? I think that that — a Petitioner in that case would have no trouble meeting — satisfying the burden this Court imposed in Bays, which is showing that that puts me at a substantial risk, objectively intolerable risk of severe pain. That threshold showing would be incredibly easy to make in that case. No, I'm saying because you just don't know about the anesthesia. Maybe the anesthesia will cover all that — the pain of being burned at the stake, or maybe it won't. The Court doesn't know. That isn't the world that we live in, and it's certainly not the world that this district court lived in. We know — we know for a fact. These are the conceded facts. Their experts said this dosage of midazolam will render these Petitioners unconscious in no more than 60 to 90 seconds. We know that induction of anesthesia is an FDA-approved indication for this Court. Induction, but not maintenance. For surgery, yes. There's a world of difference between the two, isn't there? Induction is the creation of anesthesia. Maintenance is the keeping it at that state for many hours for a surgery. It's not — we're not — Or for the time it takes for the potassium chlorides to kill somebody. And we also put on evidence that this drug is approved for usage and is commonly used for painful, invasive procedures like setting of ephemeral IV. I think the intubation example is a very good example, because we pointed out that this drug, midazolam, is regularly and routinely used for rapid-sequence intubation. Breyer. You have your — their expert saying, as I previously said, that this drug will not keep you asleep once these two others are introduced. You will be jolted into consciousness. That is his testimony. I believe he supported that with medical articles, but I'll look to see. If it turns out it is supported, we have to look to the other side to see what was refuting it. And what on the other side is refuting it, on 327, and I agree with you that this ceiling effect is a big red herring here, what actually he said that would go against it was that he said there is an extrapolation from his conclusion that 500 milligrams could cause death, and so if that much is likely to cause death, it's certainly likely to cause a coma. And a coma would prevent the person from pain. But his evidence for that was zero. We know that, in fact, lots of drugs can kill people without first putting them into a coma, and so we look to see what is it he thinks that if this kills you will first put you into a coma. And when I looked, or asked my clerks and others to look, we found zero. Now, that's my question. What can you point me to which will show that what I think is the key refutation of their expert rests upon zero? That's what I'm asking you. That's what I've tried to ask inarticulately, perhaps, but now it's more articulate. Again, and I have to make this point, whether it creates a coma or not is not the constitutionally relevant question. But based on how a central nervous system depressant works, that a central nervous system depressant. Breyer. Well, let me put it differently, not the word coma. I think what he was driving at, your expert, was that you were in a State such that you would feel no pain. And the reason he thought you were in that State is because 500mg will probably kill you. And if it's going to kill you, it must, of course, at least first put you in that State. So I'm asking the same question, but I am using the words that State in substitution for the word coma. Because of how a central nervous system depressant works. It works by depressing the function. I'm asking you for even — I really want to know where in the record does he provide support for that statement that the, quote, that State, end quote, precedes the death caused by this drug. He describes a couple of things. First, he describes the action by which the drug works as a central nervous system depressant. By causing death, it works by paralyzing the brain to such an extent that your brain forgets that your respiratory drive is knocked out, your brain forgets that. Sotomayorer But that's the clear error here. It starts right there, because the reason Evans thought that it worked to paralyze the brain is because he thought this worked on the spinal cord. And nobody argues it works on the spinal cord, number one. And number two, this is not a central nervous system drug. That's the barbiturates. This works very differently than barbiturates. This is a central nervous system depressant, just like a barbiturate. Depressant, but it's not a barbiturate, but they are both no pain-relieving qualities. No, but they are both central nervous system depressants. The barbiturates have no pain-relieving qualities, either. That's undisputed on the record. So I want to But it's still — I don't know where you're getting, just as Justice Breyer said, the proof of that. Because it's a conceded fact on this record that a 500-milligram dose will render them unconscious within the matter of 60 to 90 seconds. That means that the central nervous system depressant is working to such a state to paralyze their brain and render them unconscious. It is a conceded fact that they will be Sotomayor, but that doesn't tell me that you're not feeling pain or that a noxious stimulant like being burned alive won't cause pain. Look at what happens with the intubations. They paralyze your throat. They give you this drug, but they're paralyzing your throat. And that has its own anesthetic effect and pain relief. So what you're arguing is very different from what's happening here. They're putting a chemical inside of you that's burning you to death. That is the most noxious stimuli I can think of. Respectfully, you have that backwards on intubation. They give the paralytic, the same paralytic that's the second drug here, first to keep the patient from moving or they give them midazolam first to anesthetize them and then give them the paralytic to keep them from moving, the same paralytic that these Petitioners say caused the unconstitutional, agonizing suffering. And I'm telling you, rapid sequence intubation is done routinely, giving patients a small dose of midazolam, paralyzing them with that paralytic, causing the same  Sotomayor, they paralyze them also with the throat local anesthetic. I mean, I read it. The rapid sequence intubation describes midazolam as the first-line choice. Sure, it's the first line in a lot of things. But it doesn't keep you in an anesthetic state forever. It doesn't keep you during the procedure, during surgeries. It can. Look at the Sari article cited by their experts, which describes the use of the anesthetic. The other thing I want to point out is this 16 professors' brief, because this really is their ceiling effect in a nutshell, this figure that's in the brief. It shows that a benzodiazepine gets you right to a surgical plane of anesthesia, but not beyond. Now, first we would say a surgical plane of anesthesia is sufficient. But go to that source, the source that they cite for that chart, it's the Brenner textbook, and read what it actually says with respect to this chart. Here's what it says. Benzodiazepines exhibit a ceiling effect which precludes severe CNS depression after oral administration of these drugs. Intravenous administration of benzodiazepines can produce anesthesia. That's what the text actually says. That's what the Sari article actually says. You can produce anesthesia with these drugs. The fact that they're not commonly used as general anesthetics is because we have better choices, not because the drug is incapable of producing that effect. Now, remember, here's where their experts started. Here's where they started at the blue brief. They said that because of the ceiling effect, this drug is incapable of producing a coma. We said someone forgot to tell the FDA because the warning is right there in the FDA label about coma. So they have retreated now in the reply brief to, well, it can't reliably produce a coma. Well, if it can get someone to a coma, where's the ceiling effect? Is there some basic pharmacological principle with this drug that prevents the drug from ever getting to a coma or not? We've established that there's not. We ask you to also look at the cases out of Florida. There, for instance, Dr. Mark Heath, an anesthesiologist who was the anesthesiologist for inmate Bays in Bays v. Reese, testifying for an inmate in Florida. Sotomayor, if I come out of this argument, because you presented a lot of things to us that wasn't before either the district court or the court of appeals, wouldn't it be — and I believe that your experts didn't prove their point at all and that they showed enough — why don't we let the district court below sort out whether it still holds to its opinion based on the plethora of materials you've given us? Horwich, two quick responses. One is, they didn't meet their burden under Brewer v. Landrigan in showing that it's sure or very likely on the record that they presented. Second, we put plenty of rebuttal evidence on, enough to support the district court's finding. There's no clear error here, and the two-court rule applies, because we have a court of appeals affirming that district court's finding. Mr. Weyrich, to an extent that's unusual even in this Court, you have been listening rather than talking. And so I'm happy to give you an extra 5 minutes if you'd like, and, of course, we'll give additional time to you as well, Mr. Conrad. And hopefully we'll have a chance to hear what you have to say. I appreciate that, and I want to continue my point about ceiling effect and what evidence they put on. I told you about the first source, which was the material safety data sheet. It says nothing about a ceiling effect. We pointed that out. Nothing in the reply brief on that. Their second was this study about rats, the Hovinga study. We pointed out, again, we read that study. There's no mention of a ceiling effect. Again, no response in the reply brief. Now, that's the evidence that they put before the district court on what they said clearly demonstrates that there's a ceiling effect. Now, after the fact, when we were at the court of appeals, their expert submitted an additional declaration and cited two more sources. He cited this Hall study, which was the dog study, where they took five dogs, gave them a big dose of midazolam and clamped their tails. And that study concluded, well, we see the midazolam, the effect of the drug begins to slow at a certain point, and hypothesized, well, there may be a ceiling effect, because the drug, the effects of the drug are beginning to slow. But that study concluded, as we pointed out in the response brief, that if you take the results and you extrapolate out, once you get to about 30 milligrams per kilogram for a dog, you would achieve full surgical anesthesia, full surgical anesthesia. Now, their other expert, he cited this Sari article for the proposition that there is a ceiling effect. It just cites back to Hall, the dog study, and says, well, there may be a ceiling effect. And then it goes on to say that, in fact, this drug has been used for general anesthesia as the sole drug, and that its use was discontinued because propofol came along. It was a better choice. That was their record case for a ceiling effect. So when they stand up and say that they clearly demonstrated that there was, in fact, a ceiling effect, they're just wrong. The other study that Dr. Lubarsky cited in his after-the-fact declaration that was never submitted to the district court was the Greenblatt study. And he claimed that that study showed that at .3 milligrams per kilogram, there was a ceiling effect. We went and read the study. .3 milligrams per kilogram were never given to the patients in that study. That study was about what happens if we give .1 milligrams per kilogram of this drug at varying dosages. What happens? We pointed that out in the response brief. Nothing in the reply. Their evidence on this ceiling effect is indefensible, because if you go and read the sources, they just don't say what Dr. Lubarsky said that they say. Paradoxical effects have fallen out of the case. This lack of analgesia, again, we've pointed out, is only relevant if someone's not unconscious and insensate. They just can't avoid the fact that the district court here made this factual finding that says it's a virtual certainty. If it's a virtual certainty that they're unconscious and unaware of the pain, they cannot establish a substantial probability or an objectively intolerable risk. Thank you. Roberts. Thank you, counsel. Ms. Conrad, why don't you take 8 minutes, up to 8 minutes. Conrad. Justice Kagan, I wanted to address your hypothetical. And in this case, if the risk from using midazolam, if Petitioners are correct, manifests itself, then there will be unconstitutional pain and suffering. And my friend admitted that, that if, in fact, a person is burned alive and didn't have appropriate anesthesia, that would be unconstitutional. I guess the question I was asking was if a person was burned alive and we didn't know whether he had appropriate anesthesia, would that be unconstitutional too? That would be, Justice Kagan. And that's the point here, is that the district court below found that there is a greater risk in using midazolam, but found it was unquantifiable. And so if that risk, in fact, manifests itself, there will be a constitutionally intolerable execution. And this case is different than Brewer v. Landrigan, because in that case, the drug formula at issue was using sodium thiopentol, which was used in this case. And so the question is, if the person was burned alive and then the person was burned alive, would that be cruel and unusual punishment? Justice Alito, I think the problem isn't rendering somebody unconscious. What the problem is and what is necessary is to ensure that the person maintains a deep level of unconsciousness. Yes. So an anesthesiologist is called in to make sure that this person feels no pain whatsoever while being burned alive and then the person is burned alive. Would that not be a violation of the Eighth Amendment anyway? It could be. That's not the question, though, before this Court. And the anesthesiologist This potassium chloride is kind of like that, isn't it? It's being burned alive from the inside. That's what it is. That's exactly what it is, Justice Kagan. But what But you're not sure that being burned alive, but you think there are circumstances in which burning somebody at the stake would be consistent with the Eighth Amendment? It's an irrelevant point, but you're not certain about that? Well, what I'm saying is this Court is the Founders say burning at the stake is unconstitutional. It creates an Eighth Amendment violation. It's cruel and unusual. But in your hypothetical, if there was a way to ensure that that was done in a humane way, there could perhaps be. That — I don't think that any State would go to try to do that because we move forward to involving people. That's an incredible answer. You think that there are circumstances in which burning alive would not be a violation of the Eighth Amendment? Burning somebody alive would not be a violation of the Eighth Amendment. But potassium chloride is burning somebody alive. It's just doing it through the use of a drug. Which is what we have here. And here the district court found a risk, a risk that it could not quantify, and that risk violates the Eighth Amendment. Again, what this Court needs to understand is that the barbiturates function differently. In Bayes and in Landrigan, there was a use of a barbiturate that was known to produce a deep coma-like unconsciousness. And the reason why that's important, it doesn't matter that barbiturates also don't have analgesic properties, because we know science and medicine tells us that those drugs will reliably induce a deep coma-like unconsciousness. Midazolam cannot do this. And the my friend has said that there's no support for the ceiling effect, and we would disagree. And our expert cited studies, the study on the rats that was cited in as Exhibit 2, shows the sigmoidal Emax curve, which he explained in his testimony. The State's expert had no explanation, had no support for the testimony that he presented. When he testified, he did not have data to cite. He was incorrect. He made a mathematical error. And again, what this Court needs to understand is that giving the drug, even if it could potentially cause a toxic effect, that will not protect against the unconstitutional pain and suffering from the second and third drugs. Thank you. Roberts. Thank you, counsel. The case is submitted.